24-08409MB(MAA)

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1.      I, Fredrick McGrew, a Task Force Officer (TFO) of the Federal Bureau of Investigation (FBI), having first been duly sworn, depose and state as follows:

2.      Your Affiant makes this Affidavit in support of an application for the issuance of a search warrant authorizing agents and/or task force officers with the FBI to collect a DNA sample from JEFFREY JONES (JONES) and MICHAEL MOORE, JR. (MOORE), further described in Attachment A, for certain things particularly described in Attachment B, incorporated herein by reference.

## BACKGROUND OF AFFIANT

3.      Your affiant, Fredrick McGrew, is a Special Agent (SA) with the U.S. Customs and Border Protection (CBP) and holds special deputation status as a TFO of the FBI. I began my federal law enforcement career with CBP on January 15, 2007, and became a Special Agent with CBP on October 9, 2022. I graduated from the Federal Law Enforcement Training Center, U.S. Border Patrol Academy in Artesia, New Mexico on May 11, 2007, and the Federal Law Enforcement Training Center Criminal Investigator Training Program in Glynco, Georgia on April 24, 2023. I received training in controlled substances investigations, robbery investigations, white-collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. I received specialized training and certifications in crime scene investigation, collision investigation, interviewing and interrogation. As part of my duties with the FBI, I am charged with investigating federal crimes occurring within the District of Arizona, which include violent crimes. Your affiant has participated in criminal investigations during the course of which I have (a) conducted interviews (b) processed crime scenes for evidence (c) documented and collected evidence and (d) reviewed video surveillance. Through my training, education, and experience, I have become familiar with varying aspects of murder investigations.

4.      Pursuant to the Department of Justice Special Deputation status, your affiant is charged with investigating violations of federal laws enumerated in Title 18 of the United

States Code. Pursuant to 18 U.S.C. § 3052, your affiant is empowered to enforce criminal laws of the United States and to execute search warrants issued under the authority of the United States. Pursuant to 18 U.S.C. § 3107, your affiant is empowered to make seizures under warrant for violation of the laws of the United States.

5. As a result of my training and experience, I am familiar with federal laws, including 18 U.S.C. § 1111, which states that murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, and attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree.

6. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of JONES and MOORE, who are currently detained at the U.S. Penitentiary Tucson (USP), 9300 S Wilmot Rd. Tucson, AZ. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part.

7. Fluids and tissues of the human body such as blood, saliva, and semen contain deoxyribonucleic acid (DNA), which is a chemical substance that serves as the genetic code. Although the DNA code differs from person to person (except for identical twins),

the DNA code is the same within all the cells and tissues of a single person. DNA typing techniques commonly used in the forensic DNA laboratory can detect differences in the DNA codes from person to person. DNA typing is a very powerful technique for excluding or including an individual as the source of a biological fluid or tissue. In order to make comparisons of DNA profiles from body fluids associated with evidence materials and the DNA profile possessed by an individual, a sample of body fluid must be obtained from the individual. Because the DNA code is the same within an individual, any body fluid (i.e. blood or saliva) can be used as an exemplar for an individual.

8. Accordingly, this application requests authority to search JONES and MOORE as described in Attachment A, for evidence of this crime as described in Attachment B.

9. This court has jurisdiction over these offenses under 18 U.S.C. § 1111 because the below-described events occurred within the confines of the District of Arizona, at the U.S. Penitentiary, in Pima County, Arizona. Furthermore, this Court has jurisdiction to issue the requested warrant under Federal Rules of Criminal Procedure, Rule 41.

## SEARCH METHODOLOGY TO BE EMPLOYED

10. The process of collection will be limited to the seizure of a DNA standard by use of two (2) buccal swabs. Method of collection will be oral, that is, by inserting the buccal swabs (2) into the mouth of JONES and MOORE for the purpose of collecting a DNA standard.

## PROBABLE CAUSE

11. On October 2, 2023, USP staff was notified of a possible deceased subject in the E-2 housing unit at the USP Tucson located at, 9300 South Wilmot Road, Tucson, Arizona. USP Tucson staff arrived at the E-2 housing unit, at approximately 11:57 a.m. and encountered JONES who, according to USP staff, pointed towards his cell, cell #223, and said, "he's in here." USP staff found inmate J.U. (victim) unresponsive in the bottom bunk of JONES' cell with a cloth ligature tied around his neck. Records received from Tucson Fire Department EMS noted EMS efforts to resuscitate J.U. were ceased at 12:14 p.m.

12. An autopsy report listed the cause of death as strangulation. There was soft tissue hemorrhage on the left side of J.U.'s neck and a fracture of the right thyroid cartilage within the neck.

13. A timeline detailing USP Tucson surveillance video from October 2, 2023, received from USP Tucson, showed JONES and MOORE engaging in multiple conversations throughout the morning prior to the murder. Your affiant reviewed the USP Tucson surveillance video evidence from October 2, 2023, and observed JONES and J.U. enter cell #223, at approximately 7:59 a.m. followed by MOORE a short time later. All three individuals were in the cell until MOORE exited at approximately 8:07 a.m. followed by JONES approximately two minutes later. There was no indication that J.U. was alive after JONES and MOORE left the cell.

14. JONES and MOORE left the E-2 housing unit and went to the recreation yard at the time of the scheduled 8:00 a.m. prison "move time." The prison move time is described as dedicated times, allotted by the USP, where inmates are allowed to move from one area of the prison to another. While on the recreation yard, MOORE got into a fight with another inmate (Inmate-1) and was removed from the general population to the more restrictive Special Housing Unit (SHU). Inmate-1 was interviewed and had no knowledge as to why he was attacked, saying the attack was unprovoked. Based on information discovered through multiple interviews, your affiant believes the attack was calculated so that MOORE would not be on the prison yard when J.U.'s body was discovered, in JONES' cell, as an attempt to conceal MOORE's involvement.

15. On the day of the murder, JONES was interviewed and admitted to murdering J.U. but denied MOORE was present in the cell during the murder. After reviewing USP Tucson surveillance video, your affiant conducted a second interview of JONES in which, when challenged with the evidence, JONES admitted MOORE was in the cell at the time of the murder and helped move J.U.'s body from the floor to the bottom bunk, where it was found by USP Tucson staff.

16. Your affiant interviewed Inmate-2 who requested to speak to the FBI about the murder. Inmate-2 stated MOORE was placed in his cell, in the SHU, after MOORE's fight

on the prison yard. Inmate-2 had been in the SHU, and separated from the general prison population, for approximately three months prior to the murder and learned of the murder after MOORE told him what occurred. During the interview, Inmate-2 provided your affiant with specific information, about the murder, that would not be known by this inmate, given his three-month segregation in the restrictive housing unit. MOORE told Inmate-2 he held J.U. down while JONES strangled J.U. Inmate-2 said Moore made a gesture as if tying a rope around something while explaining about the murder. MOORE told Inmate-2 he and JONES agreed that JONES would take the blame for the murder as MOORE only had 10 years remaining on his prison sentence. MOORE told Inmate-2 he "had to help get that faggot." Your affiant received records from USP Tucson which confirmed Inmate-2 and MOORE were assigned as cellmates in the SHU beginning October 2, 2023, to October 11, 2023.

17. Your affiant interviewed Inmate-3 who said, on the day of the murder, he witnessed J.U. seated in a chair, in JONES' cell, with both JONES and MOORE standing behind him. JONES stood on J.U.'s left side while MOORE stood on J.U.'s right side. Inmate-3 saw a string wrapped around J.U.'s neck and JONES and MOORE had an end of the string in each of their hands. Your affiant reviewed USP Tucson surveillance video and identified Inmate-3 as being outside of JONES' cell during the time when J.U., JONES, and MOORE were in the cell.

18. Your affiant interviewed Inmate-4 who provided a letter, handwritten by JONES, admitting he owed $20,000 to multiple inmates, at USP Tucson, that he could not repay. JONES feared the inmates he owed and developed a plan to "catch a body", while in the SHU, so that he would be sent to another prison institution to get away from his debts. Through training, experience, and knowledge of the investigation, your affiant knows to "catch a body" is a slang term which typically means to murder or kill someone. JONES wrote that J.U. was not the original target of his plot, but he chose J.U. when his original target was sent to the SHU. JONES' written words illustrate premeditation and his intent to commit murder so that he would be sent to another prison facility; thus, relieving him of debts owed to inmates at the USP Tucson facility.

19. Your affiant interviewed Inmate-5 who requested to speak to the FBI about the murder. Inmate-5 said he was in possession of a letter, handwritten by JONES, detailing how he lured J.U. to his cell, by pretending to be gay, for the purpose of killing him. Inmate-5 said JONES wrote he and MOORE discussed the plan while they were cellmates in the SHU prior to the murder. Your affiant received records from USP Tucson which confirmed that JONES and MOORE were assigned as cellmates in the SHU from July 21, 2023, to August 30, 2023. Inmate-5 said he mailed the letter to his attorney and received confirmation it was received by his attorney January 2, 2024.

20. Evidence collected during the investigation included a shirt used to clean unknown red substance in the cell, a shirt with unknown red substance, and a ligature found around J.U.'s neck. These items will be sent to the FBI Laboratory for DNA analysis.

21. The FBI would like to collect evidence in the form of DNA from JONES and MOORE to analyze and compare to the red substance found on the clothing items and DNA that may be present on the ligature used to strangle J.U.

////

## **CONCLUSION**

22. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence described in Attachment B will support an investigation into violations of Title 18 U.S.C. § 1111, Murder. Therefore, I respectfully request the issuance of a Federal Search Warrant authorizing the collection of a DNA standard from JONES and MOORE.

23. I swear under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Respectfully submitted,

FREDRICK L MC GREW
Digitally signed by FREDRICK L MC GREW
Date: 2024.02.06 15:04:36 -07'00'
_____
FREDRICK MCGREW
Special Agent / Task Force Officer
Federal Bureau of Investigation

Subscribed electronically and sworn to me telephonically

on this 6th day of February, 2024

_____
Honorable Michael A. Ambri
United States Magistrate Judge
District of Arizona

# ATTACHMENT A

## DESCRIPTION OF PERSON TO BE SEARCHED

The person of MICHAEL MOORE, JR., male, date of birth November XX, 1972 (51), approximately 5'09" tall, approximately 145 pounds, United States Bureau of Prisons inmate number 12080-006, who is currently incarcerated at the United States Penitentiary, Tucson, Arizona.



## ATTACHMENT B

## ITEMS TO BE SEIZED

1. A DNA standard, obtained by inserting two (2) buccal swabs into the mouth of MICHAEL MOORE JR., for DNA comparison.